# EXHIBIT A

| State of Minnesota | District Court |
|---|---|
| County of Hennepin | Fourth Judicial District |

Ambient Consulting, LLC,

                Plaintiff,

vs.

FPT Software Company Limited d/b/a FPT USA Corp.,

                Defendant.

Court File Number: <u>27-CV-18-13445</u>

Case Type: Civil

**Summons**

THIS SUMMONS IS DIRECTED TO: FPT Software Company Limited d/b/a FPT USA Corp.

    1. **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons.  Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

    2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**.  You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

    Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498.

    3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint.  If you do not want to contest the claims stated in the complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the complaint.

    5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to**

**protect your rights or you may lose the case**.

    **6. ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

_____      7/31/2018
Plaintiff's attorney's signature                         Dated

    Edward F Magarian
Print or type plaintiff's attorney's name

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Civil

| | |
|---|---|
| Ambient Consulting, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>FPT Software Company Limited d/b/a FPT USA Corp.,<br><br>Defendant. | Court File No. CaseNumber<br>27-CV-18-13445      (Judge)<br>**COMPLAINT** |

Plaintiff Ambient Consulting, LLC ("Ambient") brings this action to recover for the breach of an agreement between Ambient and Defendant FPT Software Company Limited d/b/a FPT USA Corp. ("FPT") (collectively with Ambient, "the Parties"). Beginning in 2007, the Parties agreed that Ambient, a provider of information technology services, would have exclusive sales territory in Minnesota and Iowa, in exchange for Ambient's (non-exclusive) use of FPT's offshore software development services. The Parties further agreed that the charges paid by Ambient for the use of FPT's services would not exceed the charges imposed by FPT for similar services in any area where Ambient conducts business. As set forth in more detail below, FPT breached the Parties' agreements, and Ambient's trust, by imposing higher charges upon Ambient than FPT's other customers, by soliciting Ambient's customers (including one of Ambient's largest and most important clients) behind Ambient's back, and by purporting to terminate the agreement in violation

of the termination procedures to which the Parties had agreed. FPT's misconduct constitutes a breach of three different contracts between the Parties—a Master Development Agreement, dated October 1, 2007 ("MDA, attached hereto as Exhibit 1); a Sales Agreement, dated January 2010, as amended on March 1, 2011 ("Sales Agreement," attached hereto as Exhibit 2); and a Consulting Term Sheet, dated June 10, 2015 ("Consulting Term Sheet," attached hereto as Exhibit 3)—as well as tortious interference with prospective economic advantage, and fraud.

## PARTIES, JURISDICTION, AND VENUE

1.      Ambient is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.

2.      FPT is a provider of outsourcing/offshore services headquartered in Richardson, Texas, and is a subsidiary of or otherwise affiliated with FPT Software, a corporation organized under the laws of Vietnam.

3.      This Court has jurisdiction over this matter pursuant to Minn. Stat. § 484.01, subd. 1. Furthermore, the Parties have consented to the jurisdiction of this Court by contract. *See* MDA, § 21(g); Sales Agreement at 2.

4.      Venue is proper in this Court pursuant to Minn. Stat. § 542.09, based on the presence of FPT's registered agent within Hennepin County, the Parties' consent to jurisdiction of this Court by contract, and because the cause of action arises out of conduct occurring in Hennepin County.

## FACTUAL ALLEGATIONS

### I.  The 2007 MDA

5.    Ambient provides staffing on a temporary basis to companies in the technology sector.  Such services occasionally include the need to develop specialized software programs for use by Ambient's clients.

6.    On or around October 1, 2007, the Parties entered into the MDA.  Under the MDA, FPT agreed to provide outsourced software development services to Ambient, as requested by Ambient pursuant to individual statements of work.

7.    Section 6 of the MDA provides: "Developer [FPT] grants Sponsor [Ambient] an exclusivity in the territory encompassing the region of Minnesota and Iowa.  In addition, Developer agrees not to enter into any other relationship with any other company that maintains its corporate headquarters in that region."

8.    Similarly, Section 7 of the MDA provides that during the term of the MDA and for six months after its termination, "Developer agrees not to compete directly or indirectly with Sponsor," and "agrees not to solicit or provide services of the type provided by Sponsor to any of Sponsor's clients or prospective clients or to anyone else located in the State of Minnesota or Iowa."

9.    Under Section 10 of the MDA, entitled "Most Favored Customer," the Parties agreed that "the charges established under this Agreement and all Work Statements issued hereunder shall not exceed those offered or imposed with respect to similar services provided to other customers of Developer where Sponsor conducts business."  The Parties further agreed that "[if] during the term of this Agreement the Developer offers or accepts

3

lower charges for similar services involving other customers and/or under similar conditions, Developer shall so notify Sponsor and remit as a credit to Sponsor the differences between the amount of the payments theretofore made by Sponsor for such similar services and the amount that would have been payable if such lower charges had been in effect."

10.    Section 9 of the MDA provides Ambient a right to audit FPT's records. Under that section, "Developer shall maintain complete and accurate accounting records in accordance with generally accepted accounting principles to substantiate Developer's charge under each Work Statement and on each invoice," to include "payroll records, job cards, attendance cards, and job summaries or similar exhibits." FPT must preserve such records for at least two years "after completion of the pertinent work," and "Sponsor shall have access to such records for purposes of audit either through its own representative or through an accounting firm selected and paid for by Sponsor."

11.    Section 20 of the MDA describes the procedures for termination of the agreement. Under Section 20(c), "Sponsor may terminate this Agreement upon sixty (60) day written notice to Developer." Thus, Section 20 provides for termination by Ambient, but not by FPT.

12.    Under Section 20(d), "[i]n the event of any termination of this Agreement, Section 10 through 18 shall survive and continue in effect and shall inure to the benefit of and be binding upon the parties and their legal representatives, its successors and assigns."

4

## II.    The 2010 Sales Agreement

13.    On or about January 20, 2010, the Parties entered into the Sales Agreement. On or about March 1, 2011, the Parties entered into an Amendment to the Sales Agreement and a Cooperative Marketing Agreement, the terms of which are not pertinent to this action.

14.    Under the terms of the Sales Agreement, FPT was allowed to solicit clients in Minnesota and Iowa upon notice to Ambient. *See* Sales Agreement at 2 ("As to any Independent Prospects, FPT will keep Ambient Consulting informed concerning its solicitation, sales, negotiation and servicing activities and, as it deems necessary, request Ambient Consulting's support.").

15.    Under the "Financial Terms" of the Sales Agreement, FPT was required to pay a referral fee to Ambient for each FPT client located in Minnesota or Iowa, or referred to FPT by Ambient.  Sales Agreement at 3.

16.    FPT is required to pay Ambient a referral fee of 5% of all revenues received by FPT for each "Independent Prospect," defined as "[a]ny prospect or client of FPT that has in Minnesota or Iowa its headquarters or a location with which FPT works."

17.    FPT is required to pay Ambient a referral fee of 10% of all revenues received by FPT for each "Introduced Prospect," defined as "[p]rospects that are identified to FPT by Ambient Consulting or in connection with which Ambient Consulting assists FPT in solicitation, sales, negotiation, or servicing."

18.    FPT is required to pay Ambient a referral fee of 10%, plus a "goodwill cost" of 5%, of all revenues received by FPT for each "Existing Client" of Ambient, defined as "[a]ny existing/running customer of Ambient Consulting and FPT."

19.     All such referral fees are to be paid "immediately upon FPT's receipt of each payment from or for services provided to the FPT Customer."  Sales Agreement at 3.

20.     The Sales Agreement provides that "Ambient Consulting shall have the right, at its own expense, at reasonable times and upon reasonable notice, to audit the books and records of FPT (by Ambient Consulting employees directly or through auditors or other representatives selected by Ambient Consulting) to verify the payment of all amounts owing pursuant to this Agreement."  Sales Agreement at 3.

21.     The initial term of the Sales Agreement was five years from the execution of the agreement.  The Sales Agreement provides that it "shall automatically renew for subsequent two-year periods unless either party gives the other party at least 90 days written notice of termination prior to the expiration of any two year period."  Sales Agreement at 2-3.

22.     The Sales Agreement specifies that it is "separate from and does not change or modify" the MDA.

**III.   The 2015 Consulting Term Sheet**

23.     During the initial five-year term of the Sales Agreement, the parties did not identify any sales or services covered by the Sales Agreement, and no payments were made thereunder.

24.     On or about June 10, 2015, the Parties entered into the Consulting Term Sheet.

25.     The Consulting Term Sheet allowed former Ambient employee Bob Anderson to begin work for FPT, from Ambient's corporate office in Minneapolis,

Minnesota, and subject to certain restrictions. In particular, Section 7 of the Consulting Term Sheet requires Bob Anderson to "notify, and make aware, Ambient's CTO and CEO of presales activities in existing Ambient accounts." Even more specifically, if Bob Anderson "wishes to call on" Ambient's largest customer (identified by name in writing to FPT) on behalf of FPT, such activity must be "communicated to, and coordinated with" Ambient officer Andrew Grossman.

26.     Under Section 10 of the Consulting Term Sheet, "FPT agrees to pay Ambient a royalty fee of offshore revenue for any FPT services delivered to clients who are in the Ambient exclusive territory (MN and IA) as follow:

> a.  10% for 1st year; 6% for 2nd; 3% for every year thereafter, until the time the engagement ceases to exist.

> b.  In cases where FPT is making investments for a customer, or FPT has to reduce prices, the royalty fee for such cases will be discussed on a case to case basis.

## IV.   FPT Solicits Clients in Violation of the Agreements

27.     On or about January 15, 2018, FPT informed Ambient that FPT had directly solicited clients in violation of the Consulting Term Sheet, and had not paid Ambient the commissions[1] due under the Consulting Term Sheet.

28.     Purporting to pay in full the outstanding commissions owed to Ambient, as well as interest accrued on the commissions prior to the payment, FPT made a payment of $175,000 to Ambient on or about January 15, 2018. FPT did not provide a full accounting

---

[1] Although the Sales Agreement uses the term "referral fees" and the Consulting Term Sheet uses the term "royalty fees," Ambient will use the term "commissions" herein, to reflect the usage in the Parties correspondence.

of the commissions owed to Ambient at the time of that payment, and has not done so to date.

29.    FPT provided a second payment, of $29,123.37, on or about July 13, 2018. FPT again did not provide a full accounting of the commissions owed to Ambient accompanying this payment.

30.    As Ambient subsequently learned, FPT has solicited clients in Ambient's exclusive sales jurisdiction of Minnesota and Iowa, as well as Ambient's own clients, in direct violation of the MDA, Sales Agreement, and Consulting Term Sheet.

31.    In particular, Bob Anderson has solicited business from Ambient's largest customer (identified by name in writing to FPT) on behalf of FPT, without informing Ambient of such solicitation.

32.    On or about July 12, 2018, FPT publicly announced that it had entered into a partnership with Intellinet Corporation. This partnership is designed to replace FPT's partnership with Ambient, and to compete with Ambient for business in violation of the MDA, as a press release available on FPT's own website confirms. Press Release, FPT Software Company Limited, FPT and Intellinet Join Forces to Deliver "One-Stop" Digital Transformation Services Globally (July 12, 2018), *available at* https://www.fpt-software.com/fpt-and-intellinet-join-forces-to-deliver-one-stop-digital-transformation-services-globally-2/ ("This partnership enables both companies to deliver end-to-end strategic IT services on a global scale, helping clients to accelerate their Digital Transformation journey. With Intellinet's team of consultants joining FPT's taskforce, the two companies are able to provide a full range of technology solution from consultancy,

requirement definition, system design, development, implementation and maintenance for worldwide clients.") ("FPT Press Release," attached hereto as Exhibit 4).

33.    Prior to January 15, 2018, FPT never informed Ambient that FPT was soliciting Ambient's clients, or clients within Ambient's exclusive sales jurisdiction.

34.    Solicitation of Ambient's clients, or clients within Ambient's exclusive sales jurisdiction, without notice to Ambient and without payment of commissions to Ambient, is a clear violation of Sections 6 and 7 of the MDA, the Sales Agreement, and Sections 7 and 10 of the Consulting Term Sheet.

35.    In addition to a breach of the agreements between the Parties, FPT's solicitation of Ambient's clients, while FPT purportedly agreed to refrain from competing with Ambient, has harmed Ambient's business reputation.

36.    FPT has solicited business from other customers within Minnesota and Iowa, and from other clients of Ambient, in violation of the agreements.  The full extent of such solicitation will be proven in these proceedings.

## V.    FPT Charges Ambient More than Its Other Customers

37.    FPT has imposed charges upon Ambient that exceed FPT's charges for similar services, in areas where Ambient conducts business, provided to the following companies (without limitation): AllScripts, Appolis, Benfield, Diebold, Fingerhut, HES, ITR, OVM OSDC, PatientPoint, Preventice, and Vree.

38.    To date, Ambient has identified more than 250 invoices reflecting charges imposed upon Ambient that exceed FPT's charges for similar services, in areas where

Ambient conducts business. In total, these invoices show that charges imposed upon Ambient exceed such charges to other companies by more than $660,000.

39. Such charges to Ambient in excess of charges for similar services, in areas where Ambient conducts business, are in direct violation of Section 10 of the MDA.

40. Ambient expects that FPT has imposed as yet undiscovered charges upon Ambient in excess of FPT's charges for similar services, in areas where Ambient conducts business, imposed upon other companies, the full amount of such charges to be proven in these proceedings.

## VI. FPT Purports to Unilaterally Terminate the Agreements

41. On or about April 6, 2018, FPT sent a series of letters to Ambient purporting to terminate the MDA, the Sales Agreement, and the Consulting Term Sheet. FPT initially purported to terminate the agreements on 60 days' notice, but the notice was later extended to an additional 25 days by FPT, without waiver of any claims or defenses by any party.

42. FPT purported to provide 85 days' notice of termination of the MDA. The MDA expressly provides that Ambient may terminate the MDA on 60 days' notice to FPT, but provides no ability for FPT to terminate the MDA. FPT's purported termination is therefore in direct violation of Section 20 of the MDA. Moreover, under Section 20(d) of the MDA, the provisions of Sections 10 through 18 would survive any termination of the MDA.

43. FPT's letter took the position that the Sales Agreement had already been terminated by the execution of the Consulting Term Sheet. By its plain terms, however, the Consulting Term Sheet does not supersede the Sales Agreement.

44.     The Sales Agreement provides that it will automatically renew for a two-year period unless terminated by either party upon 90 days' notice.   Even if FPT provided 90 days' notice of termination, however, termination would not become effective until the end of the current two-year renewal period, in January 2019.

## VII.   FPT Refuses to Provide a Full Audit of Its Records

45.     Pursuant to its audit rights under the MDA and the Sales Agreement, Ambient has demanded a full audit of FPT records.

46.     In response, FPT has asserted that Ambient is entitled only to records regarding its operations in Minnesota and Iowa, and only for the past two years.

47.     Under Section 9 the MDA, Ambient may audit FPT's records to "substantiate Developer's charge."   That right includes substantiating that such charges comply with Section 10, the "Most Favored Customer" clause, which applies "where Sponsor conducts business."   Accordingly, Ambient's right to an audit is not confined to Minnesota and Iowa.

48.     Section 9 of the MDA provides that FPT must retain records for audit "for a period of at least two years after the completion of the pertinent work."   And the Sales Agreement provides no time limitation on Ambient's right to an audit.   Accordingly, Ambient's right to audit FPT's records is not confined to records from the past two years.

## COUNT I – BREACH OF CONTRACT (IMPROPER TERMINATION)

49.     Ambient re-alleges and incorporates the above paragraphs as if stated herein.

50.     FPT remains bound by the terms of the MDA, the Sales Agreement, and the Consulting Term Sheet, until those agreements were terminated as allowed by their plain terms.

11

51.    FPT breached Section 20 of the MDA by purporting to terminate the MDA upon 85 days' notice, when the MDA does not allow for termination by FPT, and a 85 day notice is not otherwise reasonable under the terms of the MDA.

52.    FPT breached the Sales Agreement by purporting to terminate the Sales Agreement upon 85 days' notice, when, under the terms of the Sales Agreement, FPT would remained bound by the Sales Agreement until the end of the current two-year renewal period, in January 2019.

53.    As a direct and proximate result of FPT's breach, Ambient has been damaged in an amount exceeding $50,000, plus additional interest and other charges, the exact amount to be proven in these proceedings.

## COUNT II – BREACH OF CONTRACT (MOST FAVORED CUSTOMER)

54.    Ambient re-alleges and incorporates the above paragraphs as if stated herein.

55.    FPT was contractually obligated under Section 10 of the MDA to charge Ambient no more than FPT's charges to others for similar services, in areas where Ambient conducts business.  Under Section 20(d) of the MDA, the provisions of Section 10 would survive any termination of the MDA.

56.    FPT breached Section 10 of the MDA by charging Ambient more for its services than it charged others for similar services, in areas where Ambient conducts business.

57.    As a direct and proximate result of FPT's breach, Ambient has been damaged in an amount exceeding $50,000, plus additional interest and other charges, the exact amount to be proven in these proceedings.

## COUNT III – FRAUDULENT MISREPRESENTATION

58.    Ambient re-alleges and incorporates the above paragraphs as if stated herein.

59.    FPT falsely represented that it would not solicit business in Minnesota or Iowa, or from Ambient's clients, without prior notice to Ambient.

60.    FPT knew that such representation was false and continued to be false after it was made, because FPT intended to and did actively solicit such clients at the time of the representation.

61.    FPT intended such representation to induce Ambient to continue its business relationship with FPT without discovering FPT's solicitation of such clients, and Ambient was so induced.

62.    As a result of FPT's misrepresentation, Ambient has been damaged in an amount exceeding $50,000, plus additional interest and other charges, the exact amount to be proven in these proceedings.

## COUNT IV – BREACH OF CONTRACT (INTERFERENCE WITH AUDIT RIGHTS AND ACCOUNTING)

63.    Ambient re-alleges and incorporates the above paragraphs as if stated herein.

64.    FPT was contractually obligated under Section 9 of the MDA and the Sales Agreement to allow Ambient to audit FPT's records to verify the charges imposed upon and the payments owed to Ambient.

65.    FPT breached Section 9 of the MDA and the Sales Agreement by confining Ambient's audit rights to records concerning Minnesota and Iowa, and to records from the past two years.  Neither restriction is supported by the plain text of the agreements.

66.     As a direct and proximate result of FPT's breach, Ambient has been damaged, and is entitled to enforcement of its audit rights and an accounting of all commissions and/or royalties due and owing by FPT to Ambient.

## COUNT V – BREACH OF CONTRACT (EXCLUSIVITY)

67.     Ambient re-alleges and incorporates the above paragraphs as if stated herein.

68.     FPT was contractually obligated during the term of the MDA and for a period of six months thereafter, under Sections 6 and 7 of the MDA, to refrain from soliciting business of the type provided by Ambient to any of Ambient's clients or prospective clients, or to anyone else located within Minnesota and Iowa, and to refrain from entering into any business relationship with any company other than Ambient that maintains its corporate headquarters in Minnesota or Iowa.

69.     In the event of any such solicitation, FPT was contractually obligated to notify and pay a royalty to Ambient, under the terms of the Sales Agreement, and Sections 7 and 10 of the Consulting Term Sheet.

70.     FPT breached Sections 6 and 7 of the MDA, the Sales Agreement, and Sections 7 and 10 of the Consulting Term Sheet by soliciting business within Minnesota and Iowa, and from Ambient's clients, without notice or payment of royalties to Ambient.

71.     As a direct and proximate result of FPT's breach, Ambient has been damaged in an amount exceeding $50,000, plus additional interest and other charges, the exact amount to be proven in these proceedings.

## COUNT VI – INTENTIONAL INTERFERENCE WITH PROSEPECTIVE ECONOMIC ADVANTAGE

72.    Ambient re-alleges and incorporates the above paragraphs as if stated herein.

73.    Ambient had a reasonable expectation of economic advantage regarding its existing clients, and the prospective clients within Minnesota and Iowa, Ambient's exclusive sales jurisdiction under the MDA.

74.    FPT had knowledge of such reasonable expectation of economic advantage, because it expressly agreed in the MDA not to interfere with such advantage.

75.    FPT intentionally and tortiously interfered with such advantage by soliciting business within Minnesota and Iowa, and from Ambient's existing clients, while misrepresenting to Ambient that it would abide by the terms of the Parties' agreements.

76.    In the absence of FPT's tortious interference, Ambient likely would have realized an economic advantage from its existing clients and the prospective clients within its exclusive sales jurisdiction.

77.    Ambient has not only lost business as a direct result of FPT's tortious interference, but has also suffered injury to its business reputation as a result of the same, impairing Ambient's ability to engage in future business.  Such damage is in an amount exceeding $50,000, plus additional interest and other charges, the exact amount to be proven in these proceedings.

## COUNT VII – BREACH OF CONTRACT (INTELLINET PARTNERSHIP)

78.    Ambient re-alleges and incorporates the above paragraphs as if stated herein.

79.    FPT was contractually obligated during the term of the MDA and for a period of six months thereafter, under Sections 6 and 7 of the MDA, to refrain from soliciting business of the type provided by Ambient to any of Ambient's clients or prospective clients, or to anyone else located within Minnesota and Iowa, and to refrain from entering into any business relationship with any company other than Ambient that maintains its corporate headquarters in Minnesota or Iowa.

80.    In the event of any such solicitation, FPT was contractually obligated to notify and pay a royalty to Ambient, under the terms of the Sales Agreement, and Sections 7 and 10 of the Consulting Term Sheet.

81.    FPT breached Sections 6 and 7 of the MDA, the Sales Agreement, and Sections 7 and 10 of the Consulting Term Sheet by entering into a partnership with Intellinet Corporation for the purpose of soliciting business from Ambient's clients and/or from within Minnesota and Iowa, without notice or payment of royalties to Ambient. *See* FPT Press Release ("This partnership enables both companies to deliver end-to-end strategic IT services on a global scale, helping clients to accelerate their Digital Transformation journey.").

82.    As a direct and proximate result of FPT's breach, Ambient has been damaged in an amount exceeding $50,000, plus additional interest and other charges, the exact amount to be proven in these proceedings.

## PRAYER FOR RELIEF

**WHEREFORE**, Ambient prays for judgment in this action as follows:

A.     Monetary judgment against FPT and in favor of Ambient for the amount of damages sustained by it as a result of FPT's breach of contract, fraudulent misrepresentation, and intentional interference with prospective economic advantage;

B.     An accounting of all commissions and/or royalties owed to Ambient;

C.     Declaring that Ambient is entitled to a full audit of FPT's records, unencumbered by FPT's geographical and temporal restrictions; and

D.     Such other relief as the Court shall deem just and equitable.

Dated: July 31, 2018                         DORSEY & WHITNEY LLP

                                             By _____
                                                Edward B. Magarian (#208796)
                                                magarian.edward@dorsey.com
                                                Suite 1500, 50 South Sixth Street
                                                Minneapolis, MN 55402-1498
                                                Telephone:  (612) 340-2600
                                                Facsimile:  (612) 340-2868

                                             Attorney for Plaintiff Ambient Consulting, LLC

## **ACKNOWLEDGMENT**

The undersigned hereby acknowledges that sanctions may be imposed under Minn. Stat. § 549.211.

Dated:  July 31, 2018

DORSEY & WHITNEY LLP

By  _____

Edward B. Magarian

# EXHIBIT 1

# MASTER DEVELOPMENT AGREEMENT

THIS MASTER DEVELOPMENT AGREEMENT ("this Agreement") is made and entered into this 1st day of October, 2007, by and between:

The FPT Software Joint Stock Company, a member of Corporation of Financing and Promoting Technology, a/k/a FPT Corp, the largest software outsourcing company in South East Asia based in three major cities of Vietnam: Hanoi, Da Nang, Ho Chi Minh, having its principal place of business at 89 Lang Ha Street, Hanoi, Vietnam, hereby represented by its duly authorized and empowered officer, Mr. Nguyen Thanh Nam, President, hereinafter "Developer", and

Ambient Consulting LLC. a corporation duly incorporated, organized and in good standing in Delaware, a limited liability company, United States of America, having its principal place of business at 5500 Wayzata Blvd, Minneapolis, MN 55415, USA, hereby represented by its duly authorized and empowered officer Mr. Andrew Grossman, CEO, and Molly Kridel, President, hereinafter "Sponsor".

WHEREAS, Developer is an ongoing concern located in Vietnam with the skills and necessary human and technical resources to provide and support via the Internet or other electronic methods of communication in the English language, programming services on an independent basis, and

WHEREAS, Developer desires to be engaged by Sponsor to provide the programming services and business process outsourcing services requested from time to time by Sponsor, and

WHEREAS, Sponsor desires to engage Developer from time to time pursuant to one or more Work Statements to develop, create, test and deliver over the Internet or other medium, certain programming materials as works for hire, or provide business process outsourcing services and Developer is interested in accepting such engagements, subject to the parties' agreement on the scope and terms of each such Work Statement; and

WHEREAS, Sponsor and Developer mutually desire to set forth in this Agreement certain terms applicable to all such engagements;

NOW THEREFORE, in consideration of the foregoing and of the mutual agreements, promises and covenants contained herein, Sponsor and Developer agree as follows:

## 1. DEFINITIONS

When used in this Agreement and in each Work Statement issued hereunder, the capitalized terms listed below shall have the following meanings:

1.1 **CODE** shall mean computer programming code. If not otherwise specified, Code shall include both Object Code and Source Code. Code shall also include any Maintenance Modifications or Basic Enhancements thereto created by the Developer from time to

1

time, and shall include Major Enhancements thereto when added to the Code in connection with a Work Statement issued hereunder.

1.2 **OBJECT CODE** shall mean the machine-readable form of the Code and SOURCE CODE shall mean the human-readable form of the Code and related system documentation including all comments and any procedural code such as job control language.

1.3 **DELIVERABLES** shall mean all Code, Documentation, and other materials in the English language developed for or delivered to Sponsor by Developer under this Agreement and under any Work Statement issued hereunder.

1.4 **DERIVATIVE WORK** shall mean a work that is based upon one or more preexisting works, such as a revision, modification, translation, abridgement, condensation, expansion, or any other form in which such preexisting works may be recast, transformed, or adapted, and that, if prepared without authorization of the owner of the copyright in such preexisting work, would constitute a copyright infringement. For purposes hereof, a Derivative Work shall also include any compilation that incorporates such a preexisting work.

1.5 **DOCUMENTATION** shall mean user manuals and other written manuals in the English language that relate to particular Code, including materials useful for design (e.g., logic manuals, flow charts, and principles of operation), all instructions necessary to compile, and unit test results (including unit test data). Documentation shall include any Maintenance Modifications or Basic Enhancements thereto created by the Developer from time to time, and shall include Major Enhancements thereto when added to the Documentation in connection with a Work Statement issued hereunder.

1.6 **ENHANCEMENTS** shall mean the changes or additions, other than Maintenance Modifications, to Code and related Documentation, including all new releases, that improve functions, add new functions, or significantly improve performance by changes in system design or coding.

1.7 **BASIC ENHANCEMENTS** shall mean any Enhancements that are not Major Enhancements.

1.8 **MAJOR ENHANCEMENTS** shall mean changes or additions to Code and related Documentation that (1) have a value and utility separate from the use of the Code and Documentation; (2) as a practical matter, may be priced and/ or offered separately from the Code and Documentation; and (3) are not made available to any of Developer's customers without separate charge.

1.9 **ERROR** shall mean any error, problem or defect resulting from (1) an incorrect functioning of Code, or (2) an incorrect or incomplete statement of diagram and Documentation, if such an error, problem, or defect renders the Code inoperable, causes the Code to fail to meet the specifications thereof, causes the Documentation to be

2

inaccurate or incomplete in any material respect, causes incorrect results, or causes incorrect functions to occur when any such materials are used.

1.10 **MAINTENANCE MODIFICATIONS** shall mean any modifications or revisions, other than Enhancements to Code or Documentation that corrects Errors, support new releases of the operating systems with which the Code is designed to operate, support new input/ output (i/o) devices or other classes of third party software (such as ODBC drivers, databases and reporting tools), or provide other incidental updates and corrections.

1.11 **WORK STATEMENT** shall mean a purchase offer of Sponsor or proposal to Developer or any another written instrument that meets the following requirements:

    a.  Includes substantially the following statement: "This is Work Statement under Master Development Agreements" dated_____"

    b.  Is signed on behalf of both partied by their authorized representative.

    c.  Contain the following six mandatory items:

        (1)  Description and/or specifications of the services to be performed and the Deliverable to be delivered to Sponsor.

        (2)  The name and address of the technical coordinator for each of Sponsor and Developer.

        (3)  Schedule for performance and for delivery for the Deliverables.

        (4)  The method of acceptance by Sponsor, including acceptance criteria and verification method used by Sponsor.

        (5)  The amount, schedule and method of payment.

        (6)  Completion and acceptance criteria for the Deliverables.

In addition, when applicable, the Work Statement may include:

    a.  Provisions for written and/ or oral progress reports by the Developer.

    b.  Detailed functional and technical specifications and standards for all services and Deliverables, including quality standards.

    c.  Documentation standards.

    d.  List of any special equipment to be procured by Developer or provided by Sponsor for use and performance of the work.

    e.  Test plans and scripts.

Such are the terms and conditions as may be mutually agreeable between the parties.

1.12 **INVENTIONS** shall mean any idea, design, concept, technique, invention, discovery, or improvement, regardless of patentability, made solely or jointly by Developer and/ or Developer's employees, or jointly by Developer and/ or Developer's employees with one or more employees of Sponsor, during the term of this Agreement and in performance of any work under any Work Statement issued hereunder, provided that either the conception or reduction to practice thereof occurs during the term of this Agreement and in performance of work under a Work Statement issued hereunder.

3

## 2. CONTRACT ADMINISTRATION AND STAFFING

2.1 **CONTRACT COORDINATOR.** Upon execution of this Agreement each party shall notify the other party of the name, business address and telephone number of the Contract Coordinators of each party. The Contract Coordinators of each party shall be responsible for arranging, if necessary and required, all meetings, visits, and consultations via the Internet between the parties that are of non-technical nature. The Contract Coordinator shall also be responsible for receiving all notices under this Agreement and for all administrative matters such as acceptance of Deliverables, invoices, payments and amendments.

2.2 **TECHNICAL COORDINATOR.** Each Work Statement shall state the name, business address and telephone number of the Technical Coordinators of each party. The Technical Coordinators of each party designated for a particular Work Statement shall be responsible for technical and performance matters, and the transmission and receipt of both Deliverables and technical information between the parties, insofar as they relate to such Work Statement.

2.3 **ISSUANCE OF WORK STATEMENTS.** The initial Work Statement(s) agreed to by the parties are set forth as an attachment to this Agreement. Additional Work Statements, regardless of whether they relate to the same subject matter as the initial Work Statements, shall become effective upon execution by authorized representatives of both parties. In connection with each Work Statement, the parties agree to the infrastructure requirements set forth in Appendix A, attached hereto and incorporated herein by reference.

2.4 **STAFFING.** With respect to each Work Statement, Developer agrees to assign project management, software engineering, quality assurance, and business process outsourcing staff with skills and experience as defined by Sponsor. Sponsor shall have the right of final approval of any Developer staff member ("Developer Staff") prior to such Developer Staff working on any Work Statement. Developer and/ or Sponsor shall mutually select one (1) "Team Manager" for any Work Statement. The Team Manager shall be dedicated full-time to the Work Statement.

Sponsor may select Specific Team Members for each Work Statement. A "Specific Team Member" shall be a skill set defined by Sponsor and may be a named individual, in Sponsor's sole discretion. Developer shall provide resumes to Sponsor for each Specific Team Member candidate based on the skill sets defined by Sponsor. Developer shall ensure that the selected skill set will be available within three (3) weeks of Sponsor's notice. Once selected by Sponsor, Developer guarantees the availability of each Sponsor-selected Specific Team Member.

"Contingent Resources", which are non-Specific Team Members, shall be assigned and/ or removed from a Work Statement only as directed by Sponsor, and at its discretion, on a workload-demand basis.

4

Developer shall provide an infrastructure support technician dedicated to each Work Statement at no cost to Sponsor at a ratio of one infrastructure support technician for every thirty (30) Developer Staff assigned to a Work Statement (including without limitation, Specific Team Members and Contingent Resources). Developer shall automatically and immediately assign an additional infrastructure support technician at such time as the number of persons assigned to a Work Statement exceeds intervals of thirty (30) Developer Staff (including without limitation, Specific Team Members and Contingent Resources).

2.5 **STAFFING CHANGES.** Sponsor may remove a Contingent Resource from a Work Statement, in Sponsor's sole discretion, upon two (2) weeks prior notification by e-mail to the Team Manager for such Work Statement. Sponsor may remove a Specific Team Member from a Work Statement, in Sponsor's sole discretion, upon four (4) weeks prior notification by e-mail to the Contract Coordinator.

The two-week prior notification requirement for a Contingent Resource, and the four-week prior notification requirement for a Specific Team Member shall be automatically waived by Developer in the event that a particular Contingent Resource and/ or Specific Team Member is not performing to Sponsor's expectations and Sponsor provides documentary evidence thereof to Developer. In such case, Developer shall assign a qualifying replacement Contingent Resource and/ or Specific Team Member, as the case may be, to the Work Statement as expeditiously as possible.

3. **WORK STATEMENT CHANGES.** Changes in any Work Statement or in any of the Specifications or Deliverables under any Work Statement shall become effective only when a written change request transmitted via email to the Technical Coordinator is executed by authorized representatives of both parties. Thirty (30) days after execution of this Agreement, the parties shall determine and exchange the identity of such authorized representatives. Change requests that do not substantially affect the nature of a Deliverable, its performance or functionality, and that do not change schedules by more than two (2) weeks and the allowed amounts by no more than ten percent (10%) may be requested and/ or accepted by the parties' Technical Coordinators. All other change requests with respect to this Agreement, any Work Statement or any specifications or Deliverables must be accepted by both parties' Contract Coordinators. Developer may not decline to accept any change requests that reduce the costs of performance, provided that an equitable adjustment in compensation is made for the "out-of-pocket costs" of any performance or preparation already undertaken. Developer further may not decline any change requests that increase the costs or magnitude of performance, provided that the changes are reasonable in scope and a commensurate increase in compensation is agreed to.

4. **NOTICE OF DELAY.** Developer agrees to notify Sponsor promptly of any factor, occurrence or event coming to his attention that may affect Developer's ability to meet the requirement of any Work Statement issued under this Agreement, or that is likely to occasion

5

any material delay in delivery of Deliverables. Such notice shall be given in the event of any loss or reassignment of key employees, threat of strike or major equipment failure.

5. **PAYMENT.** Upon execution of this Agreement and until the amounts received hereunder for any one-month period equal or exceed U.S. One Hundred Twenty-Five Thousand Dollars and 00/100 ($125,000.00), Sponsor agrees to pay Developer a maintenance fee of U.S. One Thousand Dollars and 00/100 ($1,000.00) per month.

In addition, Developer shall invoice Sponsor a retainer fee of U.S. Five Hundred Dollars and 00/100 ($500) per month. Such retainer fee for a particular month shall be credited to the total invoice amounts for that month otherwise owing under a Work Statement. Sponsor agrees to pay for Contingent Resources on an "as used" basis, to the extent provided in the respective Work Statement.

Sponsor charges will have 2 options:
1/ ODC - volume discounted on the following schedule:

| Resources Used/ Month | Man/ Month rate |
| --- | --- |
| 10 | U.S. $2,650 |
| 10-20 | U.S. $2,450 |
| 21-50 | U.S. $2,350 |
| over 50 | U.S. $2,250 |

2/ Fixed bid: U.S. $2,750/ Man-month.

Man/ month is defined as one hundred and ninety (190) hours per month at eight (8) hours per day, minus any Vietnamese national holidays and personal leaves as set forth in Appendix B, attached hereto and incorporate herein by reference. Developer guarantees man/ month rates from October 1, 2007 to December 31, 2009. Developer will notify the Sponsor at least ninety (90) days in advance of any proposed change to the man/ month charge. Man/ month rates shall be prorated on an hourly basis to calculate Developer's monthly invoiced amount when a Contingent Resource was used for less than a month during a calendar month.

Developer will submit invoices to Sponsor on a monthly basis. Upon acceptance of the work performed that month, Sponsor shall pay such invoice by no later than thirty (30) days following the date of acceptance by Sponsor by forwarding the amount to:

Bank: Bank for Foreign Trade of Vietnam (Vietcombank)
Branch Name: Da Nang Branch – 140-142 Le Loi, Da Nang, Viet Nam.
Beneficiary Name: FPT Software Joint Stock Company – Da Nang Branch.
A/C #: 004.137.043.2456
Routing Code: BFTVVNVX 004
If Sponsor has any reason to believe that Developer will not be able to meet any or all of the requirements of a particular Work Statement and/ or associated Deliverables, Sponsor can

6

terminate such Work Statement effective immediately upon notice to Developer and shall pay Developer a percentage of the total amount to be paid under that Work Statement equal to ninety-five percent (95%) of the percentage of work that has been completed and accepted by Sponsor.

6. **EXCLUSIVITY.** Developer grants Sponsor an exclusivity in the territory encompassing the region of Minnesota and Iowa. In addition, Developer agrees not to enter into any other relationship with any other company that maintains its corporate headquarters in that region.

7. **NON-SOLICITATION.** During the term of this Agreement and for a period of six (6) months thereafter, Developer agrees not to compete directly or indirectly with Sponsor. Without limiting the generality of the foregoing, Developer agrees not to solicit or provide services of the type provided by Sponsor to any of Sponsor's clients or prospective clients or to anyone else located in the State of Minnesota or Iowa. Developer further agrees not to offer employment or to employ or retain as an independent contractor any person who is an employee or was an employee of Sponsor in the prior six (6) months.

8. **TRAINING.** Sponsor agrees to provide Developer with the ongoing information and supervision necessary to complete the Deliverables to the extend specified in a particular Work Statement. Provided that Developer has notified Sponsor in writing and in advance as to the nature, extent and scope of training Developer might need for a particular Work Statement, Sponsor will provide such training for specific projects whenever training is not otherwise available to Developer or when a project involves the use of proprietary technology.

9. **RECORDS AND AUDIT.** Developer shall maintain complete and accurate accounting records in accordance with generally accepted accounting principles to substantiate Developer's charge under each Work Statement and on each invoice. Such records shall include payroll records, job cards, attendance cards, and job summaries or similar exhibits. Developer shall preserve such record for a period of at least two years after completion of the pertinent work. Sponsor shall have access to such records for purposes of audit either through its own representative or through an accounting firm selected and paid for by Sponsor. Any such review of Developer's records shall be conducted at reasonable times during business hours, and no more than twice annually.

10. **MOST FAVORED CUSTOMER.** Developer agrees that the charges established under this Agreement and all Work Statements issued hereunder shall not exceed those offered or imposed with respect to similar services provided to other customers of Developer where Sponsor conducts business. If during the term of this Agreement the Developer offers or accepts lower charges for similar services involving other customers and/or under similar conditions, Developer shall so notify Sponsor and remit as a credit to Sponsor the differences between the amount of the payments theretofore made by Sponsor for such similar services and the amount that would have been payable if such lower charges had been in effect.

7

11. **REPORTS.** Developer agrees to provide to Sponsor real-time access to reports on the progress of the work required under each Work Statement issued hereunder, any anticipated problems (resolved or unresolved), and any indication of delay in fixed or tentative schedules. Developer shall also meet physically or through video conferencing every six (6) months for a formal progress presentation of approximately two (2) hours duration during which Developer management shall discuss business issues. Such presentation shall provide projections of the time of completion, and the status of Developer's services and Deliverables, and shall address any problems that have come to Developer's attention and Developer's views as to how such problems may be resolved.

In addition, Developer shall, from time to time and upon reasonable notice, allow access to its premises by Sponsor for purposes of design review, walk-throughs and discussion between Sponsor and Developer as management and personnel concerning the status and conduct of work being performed under any Work Statement hereunder.

12. **DELIVERY AND ACCEPTANCE.** Developer shall deliver all Deliverables upon completion to Sponsor's Technical Coordinator for testing and acceptance. Developer shall memorialize such delivery in a delivery confirmation that sets forth the nature of the deliverables, the medium of delivery, and the date of their delivery. Sponsor's Technical Coordinator shall counter-sign such delivery confirmation so as to indicate its receipt of the contents described therein and the Delivery Confirmation shall thereupon be transmitted to the parties' contract coordinators. Unless a different procedure for testing and acceptance is set forth in a Work Statement, Sponsor's Technical Coordinator shall commence acceptance testing following its receipt of the Deliverables. Upon completion of such testing, Sponsor shall issue to Developer's Technical Coordinator notice of acceptance or rejection of the Deliverables. In the event of rejection, the Sponsor shall give its reason for rejection to Developer's Technical Coordinator in reasonable detail. Developer shall use all reasonable efforts to correct any deficiencies or non-conformities and re-submit the rejected Deliverable as promptly as possible. Payment of any sum invoiced under this Agreement of any and all Work Statements shall only become due and payable upon Sponsor's final acceptance of the approved hours and/ or Deliverable.

13. **OWNERSHIP AND RIGHTS.** All Deliverables shall be owned by Sponsor and shall be considered "work made for hire" (as such term is defined and used under U.S. Law), by Developer for Sponsor. Sponsor shall own all United States and international copyrights and other intellectual property rights in the Deliverables.

14. **VESTING OF RIGHTS.** With the sole exception of any pre-existing works identified in Section 15 hereof, Developer agrees to assign, and upon creation of a Deliverable automatically assigns, to Sponsor, its successors and assigns, ownership of all United States and international copy rights in each and every Deliverable, insofar as any such Deliverable, by operation of law, may not be considered "work made for hire" by Developer for Sponsor. From time to time, upon Sponsor's request, Developer and/ or its personnel shall confirm such assignment by execution and delivery of such assignment, confirmations or assignment,

8

or other written instruments as Sponsor may request. Sponsor, its successors and assigns, shall have the right to obtain and hold in its or their own names all copyrights registrations, and other evidence of rights that may be available for Deliverables.

15. **PRE-EXISTING WORKS.** In the event that any Deliverable constitutes a derivative work of any pre-existing work, Developer shall ensure that the Work Statement pertaining to such Deliverables so indicates by reference to: (1) the nature of such pre-existing work; (2) its owner; (3) any restrictions or realty terms applicable to Developer's use of such pre-existing work or Sponsor's expectation of the Deliverable as a derivative work thereof; and (4) the source of Developer's authority to employ the pre-existing work in the preparation of the Deliverable. Unless otherwise specifically agreed in the Work Statement pertaining to such Deliverable, before initiating the preparation of any Deliverable that is derivative of a pre-existing work, Developer shall cause Sponsor, its successors and assigns, to have and own the irrevocable, non-exclusive world-wide royalty-free right and license to: (1) use, execute, reproduce, display, perform, distribute internally or externally, sell copies of, and prepare derivative works based upon all pre-existing works and derivative works thereof, and (2) authorize or sublicense others from time to time to do any or all of the foregoing.

16. **VESTING OF RIGHTS.** Developer hereby grants to Sponsor, its successors and assigns, all inventions together with the right to seek protection by obtaining patent rights thereof and to claim all rights of priority there under, and the same shall become and remain the Sponsor's property regardless of whether such protection is sound. Developer shall promptly make a complete written disclosure to Sponsor of each invention not otherwise clearly disclosed in the pertinent deliverables, specifically pointing out the features or concept that Developer believes to be new or different. Developer shall, upon Sponsor's request and at Sponsor's expense, cause application to be filed therein, through solicitors designated by Sponsor, and shall forthwith sign all such applications over to Sponsor, its successors and assigns. Developer shall give Sponsor and its solicitors all reasonable assistance in connection with the presentation and prosecution of any such patent applications and shall cause to be executed all such assignments or other instruments or documents as Sponsor may consider necessary or appropriate to carry out the intent of this Agreement.

Developer hereby grants to Sponsor, its successors and assigns, the royalty-free, world-wide, non-exclusive right and license under any patents owned by Developer, or with respect to which Developer has a right to grant such rights and licenses, to the extent required by Sponsor to exploit the Deliverables and exercise its full rights in the Deliverables, including (without limitation) the right to make, use, and sell products and services based on or incorporating the Deliverables.

17. **AVOIDANCE OF INFRINGEMENT.** In performing services under this Agreement, Developer agrees to avoid designing or developing any items that infringe one or more patents or intellectual property rights of any third party. If Developer becomes aware of such possible infringement in the course of performing work under any Work Statement issued thereunder, Developer shall immediately so notify Sponsor in writing. Developer hereby

9

holds Sponsor harmless against any and all claim of infringement by any third party against any work performed under any Work Statement.

18. **CONFIDENTIAL INFORMATION.** No Confidential Information of Developer: It is understood and agreed that Sponsor does not wish to receive from Developer any confidential information of Developer or of any third party. Developer represents and warrants that any information provided to Sponsor in the course of entering into this Agreement or any Work Statement or performing work under any Work Statement issued there under shall not become confidential or proprietary to Developer. (No other communication allowable.)

Confidential Information of Sponsor: From time to time, Sponsor may provide its own confidential business and technical information to Developer in connection with the work to be performed by Developer under Work Statement issued there under. Such information shall be designated as confidential upon or prior to disclosure by Sponsor. In addition, the operation and specification of the deliverables shall, in all instances, be treated as confidential. All written material shall be considered Confidential. Developer shall prohibit any use or disclosure of Sponsor's confidential information, except as necessary to perform work under these Work Statements issued there under.

19. **REPRESENTATION AND WARRANTIES.** The following representations and warranties for the benefit of Sponsor, as a present and on-going affirmation of facts in existence at all times when this Agreement or any Work Statement issued there under is in effect:

   a. Developer has received a Capability Maturity Mode Integration (CMMi) level 5 certification and such certification has not been down-graded.

   b. **No Conflict.** Sponsor represents and warrants that it is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere or conflict with, or that does or would present conflict of interest concerning, the work to be performed by Developer and of this Agreement and each Work Statement issued there under.

   c. **Ownership Rights.** Developer represents and warrants that:

      (1) except as provided in Section 14 hereof with respect to certain identified pre-existing works licensed to Sponsor, it is and will be the solely author of all works employed by Developer in preparing any and all Deliverables;

      (2) it has and will have full and sufficient right to assign or grant the rights and/ or licenses granted in the Deliverables pursuant to this Agreement;

      (3) all Deliverables including all pre-existing works addressed in Section 14 hereof, have not been and will not be published under circumstances that would cause a loss of copyright therein; and

      (4) all Deliverables, including all pre-existing work addressed in Section 14 hereof, do not and will not infringe any patents, copyrights, trade marks or any other intellectual property rights (including trade secrets), privacy or similar rights of any third party, nor has any claim (whether or not embodied in an action, past or present) of such infringement, threatened or

10

asserted, nor is such a claim pending, against Developer (or, insofar as Developer is aware, any entity from which Developer has obtained such rights).

d. **Conformity, Performance and Compliance.** Developer represents and warrants (1) that all Deliverables shall be prepared with professional diligence and skill; (2) that all Deliverables will function on the machines and with operating systems for which they are designed; (3) that all Deliverables will conform to the specifications and functions set forth in the Work Statement relating thereto; and (4) that Developer will perform all work called for by each Work Statement issued there under in compliance with applicable law.

## 20. TERMINATION.

a. **Term of Agreement.** This Agreement shall be effective upon the date specified at the beginning thereof and shall remain in force, unless otherwise terminated as provided herein. However, this Agreement shall continue and remain in effect with respect to any Work Statement already issued there under at the time of such termination, until such Work Statements are themselves terminated or performance thereunder is completed.

b. **Termination of Work Statement.** Sponsor may, at its sole option, terminate any or all Work Statements outstanding, or any portion thereof, upon fifteen (15) days written notice. Upon receipt of notice of termination, Developer shall inform Sponsor of the extent to which performance has been completed through such date, and collect and immediately deliver to Sponsor whatever work product then exists in a manner prescribed by Sponsor. Developer shall be paid for all work performed through the date of termination, provided that such payment shall not be greater than the payment that would have become due if the work had been completed. Developer may not terminate any Work Statement once Developer has entered into such Work Statement.

c. **Termination of Agreement.** Sponsor may terminate this Agreement upon sixty (60) day written notice to Developer. However, this Agreement shall continue and remain in effect with respect to any Work Statement already issued there under until such other Work Statement is itself terminated and/ or performance there under is completed.

d. **Survival.** In the event of any termination of this Agreement, Section 10 through 18 shall survive and continue in effect and shall inure to the benefit of and be binding upon the parties and their legal representatives, its successors and assigns.

## 21. MISCELLANEOUS

a. **Force Majeure.** Either party shall be excused from delays in performing or from its failure to perform thereunder to the extent such delays or failures results from causes beyond the reasonable control of such party; provided that in order to be

11

excused from delay or failure to perform, such party must act diligently to remedy the cause of such delay or failure.

b. **No Agency.** Developer, in rendering performance under Work Statements issued thereunder from time to time, is acting solely as an independent contractor. Sponsor does not undertake by this Agreement or otherwise to perform any obligation of Developer, whether by regulation or contract. In no way is Developer to be construed as an agent or to be acting as the agent of Sponsor in any respect, any other provisions of this Agreement or any Work Statement issued thereunder notwithstanding.

c. **Multiple Counterparts.** This Agreement may be executed in several counterparts, all of which taken together shall constitute one single agreement between the parties.

d. **Section Heading Exhibits.** This section and subsection headings used therein are for reference and convenience only, and shall not enter into the interpretation area. The exhibits referred to herein and attached hereto, or to be attached hereto, including all Work Statements issued hereunder from time to time, are incorporated herein to the same extent as if set forth in full.

e. **Required Approval.** Where agreement, approval, acceptance or consent by either party is required by any provision of this Agreement, such action shall not be unreasonably delayed or withheld.

f. **No Waiver.** No delay or omission by either party hereto to exercise any right or power or curing upon any non-compliance or default by the other party with respect to any of the terms of this Agreement or any Work Statement shall impair any such right or power or to be construed to be a waiver thereof. A waiver by either of the parties thereto of any of the covenants, conditions, or agreements to be performed by the other shall not be construed to be a waiver of any succeeding breach thereof or of any covenant, condition or agreement herein contained. Unless stated otherwise, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise.

g. **Authority Of Developer.** Developer has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed all work to be carried by Developer hereunder unless otherwise provided herein.

h. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without regard to the conflict of laws provisions thereof, and the parties specifically agree and consent to jurisdiction in the federal or state courts of Minnesota to the exclusion of any other court.

Both parties agree to abide by all applicable laws and regulations including, but not limited to the U.S Foreign Corporate Practices Act and further agree to follow U.S. Accounting Practices and Standards.

i.  **Entire Agreement.** This Agreement and the appendices annexed hereto, together
    with Work Statements issued from time to time, constitute the entire Agreement
    between the parties. No change, waiver or discharge hereof regardless of the mode
    of communication used, shall be valid unless it is in writing and is executed by an
    authorized and empowered representative of the party against whom such a
    change, waiver or discharge is sought to be enforced.

j.  **Notices.** Under this Agreement if one party is required to give notice to the other,
    such notice shall be deemed given if sent by email with confirmation copy sent by
    airmail, postage pre-paid and addressed at the address mentioned above.

k.  **No Assignment.** Developer may not, without the prior written consent of Sponsor,
    assign or transfer this Agreement or any obligation incurred thereunder for any
    reason, including merger, reorganization, consolidation or sell of all or
    substantially all of the Developer's assets. Any attempt to do so in contravention
    of this section shall be void and to no force and effect. Sponsor shall be entitled to
    assign or transfer this Agreement or any obligation incurred thereunder to any
    affiliated company of Sponsor or to any company succeeding to all or any portion
    of Sponsor's business.

**IN WITNESS WHEREOF**

Sponsor and Developer have caused this Master Development Agreement to be signed
and delivered by their duly authorized officers, all as of the dates first written.

SPONSOR:

By: _____ 10/16/07
    David Cole   CFO

DEVELOPER:

By: _____

Nguyễn Thành Nam

13

## Appendix A

Developer shall provide the infrastructure for each Work Statement as mutually agreed between both sides upon the establishment of OSDC. All associated costs shall be included in the monthly maintenance fee and/ or man-month rate, except where noted.


**Other Notes:**

1. Developer will provide a separate test environment for each Work Statement.
2. Developer will provide workspace for up to three (3) visitors for Sponsor, including telephone and desktop access.
3. If Sponsor decides to set up a Virtual Private Network (VPN), Sponsor will be responsible for purchasing the required hardware (router, NTU) and the leasing of a dedicated telecom line.
4. Sponsor is responsible for providing application server software for development.
5. Back-up. Developer will perform a full backup every Saturday night and an incremental backup at 21h00 each working day. The backup process is automated. The set of 7 tapes will be used in roll-over mode. If requested by Sponsor, a second set of backup tapes will be produced and kept at a secure location. In such event, Sponsor shall be responsible for purchasing second tape drive.
6. If Sponsor desires secondary (non-tape) backup, Sponsor should purchase CD-Writer and blank CDs.
7. Network security. For each Work Statement, Developer's network will be separated from the main LAN by a central switch. This ensures that the Work Statement LAN traffic cannot be "sniffed" by people outside of the Work Statement. The connection to the main LAN is required in order to allow Developer members to access the shared Internet facility & internal information databases (such as Policy and Procedures, etc).
8. CMMi. Developer will provide each Work Statement with CMMi process audit and improvement services in Sponsor's sole discretion.
9. Developer will provide the maintenance for all hardware for each Work Statement. If Sponsor adds additional hardware with respect to any Work Statement, Developer shall provide maintenance at most favored rates.

**Appendix B**

Developer Staff take leave on the following holidays:

- Solar New Year: 01 day on January 1st
- Lunar New Year: 04 days in the middle of February
- Liberation Day: 01 day on April 30th
- Labour Day: 01 day on May 1st
- Company's Founding Celebration: 01 day on September 13th
- National day: 01 day on September 2nd

In addition, Developer Staff are entitled to take twelve (12) days of personal vacation annually (inclusive of Developer's Summer Holiday).

# EXHIBIT 2





## SALES AGREEMENT BETWEEN

## FPT SOFTWARE & AMBIENT CONSULTING

Ambient Consulting LLC. ("Ambient Consulting") is a limited liability company duly incorporated, organized and in good standing under the laws of the state of in Delaware, United States of America, having its principal place of business at 5500 Wayzata Blvd, Minneapolis, MN 55415, USA.

"FPT Corp." (FPT Building, Pham Hung Str, Cau Giay District, Hanoi, Vietnam) is a Vietnam Corporation; "FPT Software" JSC (FPT Building, Pham Hung Str, Cau Giay District, Hanoi, Vietnam) is a Vietnam Corporation and FPT USA "FUSA" (177 Bovet Road, #130, San Mateo, CA 94402) is a USA Corporation. is a subsidiary of FPT Software incorporated and in good standing under the laws of Delaware, USA.

FPT Corp., FPT Software, FPT USA Corp., hereby represented by FPT USA and Ambient Consulting want to expand their customer base in the USA by taking advantage of FPT Corp's FPT Software's and FPT USA Corp's US based sales and technical support team to actively support Ambient Consulting sales efforts, and to take advantage of Ambient Consulting's business development and sales team in the USA.

<u>Sales Agreement</u>

FPT Corp., FPT Software and FPT USA Corp., represented by FPT USA Corp. herein after referred to as "FPT" and Ambient Consulting hereby agree as follows:

FPT hereby appoints Ambient Consulting, including its authorized sales representatives and agents, as its authorized representative to: find prospects for any and all services provided by FPT, including but not limited to the right to pursue and solicit prospects for FPT either from leads provided by FPT or leads developed independently by Ambient Consulting or leads developed jointly and to introduce prospects to FPT.  (Prospects that are identified to FPT by Ambient Consulting or in connection with which Ambient Consulting assists FPT in solicitation, sales, negotiation or servicing are referred to in this Agreement as "Introduced Prospects.")  Ambient Consulting agrees to support FPT as reasonably requested by FPT in sales meetings, sales calls, and negotiation where necessary for all Introduced Prospects, with the objective of assisting FPT to enter into a signed contract with the Introduced Prospect for services to be rendered by FPT. FPT agrees to: supply leads; do front-end sales activities; actively approach Introduced Prospects; involve Ambient Consulting where necessary to enter into a signed contract with an Introduced

Prospect; be responsible for pricing negotiation; obtain a signed contract with Introduced Prospects.

Any prospect or client of FPT that has in Minnesota or Iowa its headquarters or a location with which FPT works is referred to in this Agreement as an "Independent Prospect". As to Independent Prospects, FPT will keep Ambient Consulting informed concerning its solicitation, sales, negotiation and servicing activities and, as it deems necessary, request Ambient Consulting's support.

Any existing/running customer of Ambient Consulting and FPT is referred to in this Agreement as an "Existing Client".

Once the Independent Prospect has entered into a contract for services with FPT, the Independent Prospect shall be considered for all purposes a "FPT Customer Type 1". Once the Introduced Prospect has entered into a contract for services with FPT, the Introduced Prospect shall be considered for all purposes a "FPT Customer Type 2". Once the Existing Client has entered into a contract for services with FPT, the Existing Client shall be considered for all purposes a "FPT Customer Type 3"

For all Introduced Prospects and Independent Prospects and Existing Clients who become FPT Customers (Type 1 or Type 2 or Type 3), the revenue received from such FPT Customers shall be shared as set forth in "Financial Terms".

Onsite components:

For short term onsite period (3 months or less) with purposes including but not limited to training, knowledge transfer, BA, technical design, deployment and other services that serve as the initial phase for project kick-off and wrap-up, FPT shall actively use its internal resources to allocate to such services

For long term onsite period with the purpose of carrying out permanent project management, business analysis, and architecture type of work, unless FPT Customers does not want local onshore consultants or the price point does not allow Ambient Consulting to use onshore consultants, FPT shall subcontract with Ambient Consulting, at Ambient Consulting's customary rates and on its customary terms and conditions, to provide any onsite project management or other services to be provided in Minnesota or Iowa to any FPT Customer ("Ambient Services"), and FPT shall not provide any such services except through Ambient Consulting as a subcontractor, unless Ambient Consulting shall decline to provide such services.

FPT shall be solely responsible for providing any services to FPT Customers (other than Ambient Services) and agrees to defend, indemnify and hold harmless Ambient Consulting from any and all claims, demands, liability or suits of any type from any FPT Customer (other than claims, demands, liabilities or suits arising solely out of actions of Ambient Consulting in providing Ambient Services). The Parties agree that this Agreement will be governed by and interpreted in accordance with the laws of the State of Minnesota, USA without regard to conflicts of law principles. In the event of any dispute the parties irrevocably submit to the jurisdiction of any Court sitting in Minnesota, USA or the United States District Court for the State of Minnesota, and hereby waive any objection to jurisdiction and venue in any such court, and waive any claim that such forum is an inconvenient forum. The term of this Agreement shall be five years from the date set forth below and shall automatically renew for subsequent two-year periods unless either party

gives the other party at least 90 days written notice of termination prior to the expiration of any two year period. Any change to this Agreement can be proposed at any time by any Parties and shall need to be approved by both Parties to take effect. This Agreement is separate from and does not change or modify the Ambient - FSoft Master Agreement (2007) - Final (20071011) effective October 11, 2007 (including, without limitation, any non-competition and non-solicitation covenants therein).

Ambient Consulting shall have the right, at its own expense, at reasonable times and upon reasonable notice, to audit the books and records of FPT (by Ambient Consulting employees directly or through auditors or other representatives selected by Ambient Consulting) to verify the payment of all amounts owing pursuant to this Agreement.

Effective this _____ day of January 2010

Financial Terms

For FPT Customer Type 1, FPT shall pay to Ambient Consulting a referral fee of five percent (5%) of all revenues received by FPT from or for services provided to each FPT Customer, such amounts to be paid by FPT to Ambient Consulting immediately upon FPT's receipt of each payment from or for services provided to the FPT Customer.

For FPT Customer Type 2, FPT shall pay to Ambient Consulting a referral fee of ten percent (10%) of all revenues received by FPT from or for services provided to each FPT Customer, such amounts to be paid by FPT to Ambient Consulting immediately upon FPT's receipt of each payment from or for services provided to the FPT Customer.

For FPT Customer Type 3, FPT shall pay to Ambient Consulting a referral fee of ten percent (10%) plus a "goodwill cost" of five percent (5%) of all revenues received by FPT from or for services provided to each FPT Customer which makes the total amount of fifteen percent (15%), such amounts to be paid by FPT to Ambient Consulting immediately upon FPT's receipt of each payment from or for services provided to the FPT Customer.

All onsite expenses will be excluded from the revenue sharing schema (i.e., the revenue from which FPT pays Ambient Consulting a referral fee pursuant to the preceding paragraph excludes amounts paid to FPT not as fees but in reimbursement for out-of-pocket expenses).

FPT's obligation to make payments to Ambient Consulting pursuant to these financial terms shall survive the expiration of the term of this Agreement or the termination of this Agreement for any reason (a) as to contracts with FPT customers in effect prior to such expiration or termination, for the term of such contracts, and (b) as to any individual or entity that was an Introduced Prospect or Independent Prospect as of the date of such expiration or termination (whether or not such Introduced Prospect or Independent Prospect was then a FPT Customer), for all services provided or payments made during the 12 month period following such expiration or termination.

FPT USA Corp.                                        Ambient Consulting LLC

By: _____          By: _____
Its: _____          Its: _____

3

# EXHIBIT 3

**FPT / Ambient Consulting Term Sheet**

1. Bob Andersen spends adequate time transitioning his current Ambient accounts to a new Ambient sales rep, once hired. This should take no longer than one week.

2. Bob Andersen, at his and FPT's discretion, works out of the Ambient corporate office in Mpls. Bob will be given an office, phone, PC, etc. This will be provided at no charge to FPT.

3. Bob Andersen can utilize Ambient's CTO, when requested, to help on pre-sales opportunities, both within and outside of Ambient's exclusive territory. This includes collateral generation, proposal writing, solution planning, meeting attendance, presentations, etc.

4. Ambient CTO time on FPT presales opportunities in the MN and IA markets (Ambient exclusive) will be provided at no charge to FPT, but will not exceed more than 40 hours per month. These opportunities must be qualified (approved by both parties) before using Ambient CTO time.

5. Ambient CTO time, at FPT's request, on presales opportunities outside of the Ambient exclusive market will be provided at $250 per hour, in addition to Travel and Living expenses.

6. Ambient CTO travel time outside of the Twin Cities area will be charged at $100 per hour.

7. Bob Andersen is allowed to sell FPT services direct to clients in Ambient's exclusive market (Minnesota and Iowa), with the following restrictions:
   a. For a period of one year, Bob will not be allowed to sell directly into Ambient clients where Ambient and FPT have jointly sold and delivered offshore services in the past twelve (12) months. A list can be provided. This restriction can be waived at the request of FPT and approval of Ambient's CEO.
   b. At any time, Bob must notify, and make aware, Ambient's CTO and CEO of presales activities in existing Ambient accounts. If Bob wishes to call on REDACTED, this activity needs to be communicated to, and coordinated with, Andrew Grossman. The intent of this restriction is not to hamper Bob's sales efforts in these existing accounts. Collectively, we believe Ambient and FPT need to communicate and coordinate efforts in these accounts to maximize our collective effectiveness and market share. Note, the intent of this clause is to coordinate sales efforts with **existing** Ambient clients (current and future). We are less concerned about past clients.

8. If Bob sells FPT Services that require local onshore resources, Ambient shall have the right of first refusal for any local onshore resources in Ambient's exclusive territory (MN and IA) in case FPT is unable to fulfill those positions.

9. FPT can utilize Ambient's recruiting team (currently staffed at five senior recruiters) on a national basis for any onshore resource needs that come up in any FPT territory. Ambient and FPT will negotiate a set mark-up on any onshore consultants that Ambient sources for FPT.

10. FPT agrees to pay Ambient a royalty fee of offshore revenue for any FPT services delivered to clients who are in the Ambient exclusive territory (MN and IA) as follow:

    a. 10% for 1st year; 6% for 2nd; 3% for every year thereafter, until the time the engagement ceases to exist.
    b. In cases where FPT is making investments for a customer, or FPT has to reduce prices, the royalty fee for such cases will be discussed on a case to case basis.

11. This agreement will remain in effect, unless terminated by either party (termination parameters to be discussed and agreed upon), after which the existing Master Development Agreement will be in full force and effect.
Note: if there is any conflict between this agreement and the existing MDA, this agreement supersedes.

12. This agreement will remain in effect with respect to any clients already doing business directly with FPT until FPT's performance at those clients is completed.
Note: this will apply for clients: who is existing client of Ambient in last 12-month; and new clients who are in MN, IA and FPT services are delivered in these two states.

FPT USA Corp.                          Ambient Consulting LLC
By: _____                 By: _____
Its: ____CEO____                      Its: ____C Eo____

# EXHIBIT 4

FPT and Intellinet join forces to deliver "one-stop" Digital Transformation services globally – FPT Software – Powering Digital Transformation

 Software    Services ▾    Industries ▾    Products ▾    FPT Software Insight ▾    Resource Center ▾    About us ▾    ☐    Global ▾    Career

# FPT and Intellinet join forces to deliver "one-stop" Digital Transformation services globally

Category: Press Release | July 12, 2018

*FPT makes strategic investment in Intellinet to expand its digital transformation leadership, aiming to provide more strategic and comprehensive services to leading global companies.*

(ATLANTA, GA) – July 12, 2018 – FPT, the global leading IT Service Provider headquartered in Vietnam and Intellinet, a US-based purpose-driven management consulting and technology services firm, today have reached a definitive agreement for FPT to become the major shareholder of Intellinet, expanding the company's footprint in the United States.

Under this agreement, Intellinet will continue to operate as an independent organization; however, the two sides will be able to leverage each other's strengths. With this new partnership, Intellinet enhances FPT's offerings with strategy and management consulting capabilities and becomes part of a company with deep offshore capacity, focusing on digital transformation.

FPT, by partnering with the world's technology disruptors such as Amazon Web Services, Microsoft, Siemens, GE etc., has continuously enhanced its technology as well as domain expertise to help provide more value-added services to clients worldwide. The company has been providing technology services for nearly 200 customers in the U.S. from various business domains, including Aerospace & Aviation, Healthcare, Banking & Finance, Telecommunications, Retail, and Automotive. Meanwhile, Intellinet's strategy and technology consulting capability in transforming client's business, providing customers seamless digital experiences has been proven throughout 25 years of operation with thousands projects successfully delivered, helping clients to maximize their investment and increase business efficiency.

This partnership enables both companies to deliver end-to-end strategic IT services on a global scale, helping clients to accelerate their Digital Transformation journey. With Intellinet's team of consultants joining FPT's taskforce, the two companies are able to provide a full range of technology solution from consultancy, requirement definition, system design, development, implementation and maintenance for worldwide clients.

"Becoming technology partner of global enterprises in the Fourth Industrial Revolution, we realize that there exists a huge demand in Digital Transformation consultancy and implementation services. By making strategic investment in Intellinet, FPT is now more than ready to provide comprehensive Digital Transformation solution for top companies, elevating Vietnam's position on the global technology map.", said Mr. Truong Gia Binh, Chairman of FPT Corporation.

"After 25 years of leading Intellinet as Founder & Chairman, today I am pleased to announce that Intellinet is becoming the U.S. gateway to a global organization through a strategic equity investment by FPT Software" said Frank Bell, Intellinet's Founder and Chairman of the board. "I couldn't be more proud of Intellinet and our leadership team. I am excited to be a part of this transaction and the opportunity it creates to grow Intellinet into the global technology leader we have always believed it had the potential to become."

"We are thrilled to join the FPT family" said Mark Seeley, Intellinet's Chief Executive Officer. "By combining our business acumen, industry expertise, and technology execution, our teams can deliver more innovation and transformational solutions that will truly make a measurable impact on our clients' businesses."

About FPT

## NEWS

» FPT and Intellinet join forces to deliver "one-stop" Digital Transformation services globally

» FPT to develop Telecommunication Helpdesk Chatbot

» FPT Japan named as Fujitsu's Core Partners 2018

» FPT to embrace cooperation opportunities in Europe

» FPT Software and Toshiba jointly reinvent manufacturing process

## PRESS RELEASE

» FPT and Intellinet join forces to deliver "one-stop" Digital Transformation services globally

» FPT Software Recognized as First ASEAN-Headquartered AWS Premier Consulting Partner

» FPT Software and Siemens Join Forces to Push Forward the Expansion of MindSphere IoT Operating System

» FPT and Siemens Partners in MindSphere IoT Operating System

» FPT and Arago Announce Strategic Global Partnership to Enhance IT Service Offerings With AI Technology

✉ fsoft contact@fsoft.com.vn

FPT and Intellinet join forces to deliver "one-stop" Digital Transformation services globally – FPT Software – Powering Digital Transformation

FPT Corporation is the global leading technology and IT services group headquartered in Vietnam with nearly US$2 billion in revenue and 32,000 employees. Qualified with CMMI Level 5 & ISO 27001:2013, ASPICE LEVEL 3, FPT delivers world-class services in Smart factory, Digital platform, RPA, AI, IoT, Enterprise Mobilization, Cloud, AR/VR, Embedded System, Managed service, Testing, Platform modernization, Business Applications, Application Service, BPO and more services globally from delivery centers across the United States, Japan, Europe, Australia, Vietnam and the Asia Pacific. With focus on R&D activities to improve quality of services, the company has been serving over 450 customers worldwide, of which more than 70 are Fortune 500 companies in the industries of Aerospace & Aviation, Automotive, Banking and Finance, Communications, Media and Services, Logistics & Transportation, Utilities, Consumer Packaged Goods, Healthcare, Manufacturing, Public sector, Technology and more. For more information, please visit www.fpt-software.com/.

**About Intellinet**

Intellinet is a purpose-driven management consulting & technology services firm.  Intellinet delivers value-creating solutions and material impact for clients through industry-aligned strategy, digital, and technology services.  The company partners with future-minded corporate leaders who value execution excellence in both business and digital transformation. With an experience-driven mindset, the company leads boldly and innovate alongside our clients, enabling them to realize the full business value of today's technologies.  Intellinet has received over 70 worldwide, national, and regional awards for delivery excellence, customer satisfaction, and employment experience since its inception in 1993.  Intellinet has offices in Atlanta, Charlotte, Boston, and Hartford, serving many of the United States' Fortune 500 companies.  For more information, please visit www.intellinet.com.

**Tagged**  Acquisition, Intellinet, M&A

**LATEST NEWS**

FPU Software

Follow Us

## About us

About FPT Software

Why FPT Software?

Our Campus

Our Partner Network

Board of Management

Global Presence

## Our Resource Center

Innovation Hub

Case Studies

Whitepapers

## Industries

Automotive

Banking & Finance (BFSI)

Media & Entertainment

Heal hcare

## FPT Software Insight

Customer Testimonials

Press Releases

News

Event Calendar

## Services

**Digital consulting**          **Digital Manufacturing**          **Next-gen technologies**          **Traditional Outsourcing**

FPT and Intellinet join forces to deliver "one-stop" Digital Transformation services globally – FPT Software – Powering Digital Transformation

| | | | |
|---|---|---|---|
| Agile Factory – Renovation Lab | Smart Factory | AI | Applica ion Services |
| Digital Transformation Consultancy | Building Information Modeling | Robotics Process Automation | Business Applications |
| Digital Solutions | Connected Vehicles | AR/ VR | Business Process Services |
| | | Blockchain | Managed Services |
| | | Cloud Professional Services | Legacy Migra ion |
| | | Data Analytics | Testing |
| | | Enterprise Mobiliza ion | IC Design |
| | | IoT | |

Copyright © 2018 Fpt Software.   Terms of use  |  Privacy Statement  |  Contact us  |  Risk & Violation Reporting  |  Career @ FPT Software

https://www.fpt-software.com/fpt-and-intellinet-join-forces-to-deliver-one-stop-digital-transformation-services-globally-2/[7/31/2018 11 28 20 AM]

# EXHIBIT B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

---

Federal National Mortgage Association,

Plaintiff,

vs.

Andrew C. Grossman;
Andrew Grossman Revocable Trust, under
Agreement dated June 23, 2005;
ABCO Research LLC;
Venerable Group, LLC;
Ambient Consulting, LLC; and
Grossman Investments, LLC,

Defendants.

Court File No. 12-2953
(SRN/JJG)

**ANSWER OF
ABCO RESEARCH, LLC,
AMBIENT CONSULTING, LLC,
AND
GROSSMAN INVESTMENTS, LLC**

---

Defendants ABCO Research, LLC, Ambient Consulting, LLC, and

Grossman Investments, LLC (the "Answering Defendants"), for their Answer to

Plaintiff's Complaint, state as follows:

### FIRST DEFENSE

1.      Except as specifically admitted herein, Answering Defendants deny

each and every allegation of the Complaint.

2.      Answering Defendants deny the allegations of paragraph 1 of the

Complaint.

3.      Answering Defendants do not have sufficient information to admit

or deny the allegations of paragraph 2 of the Complaint, and therefore deny such

allegations, except that Answering Defendants admit that Fannie Mae is a federally chartered institution.

4.     The allegations of paragraph 3 and 4 of the Complaint do not relate to Answering Defendants, and therefore no further response is required.

5.     Answering Defendants admit the allegations of paragraph 5 of the Complaint.

6.     The allegations of paragraph 6 of the Complaint do not relate to Answering Defendants, and therefore no further response is required.

7.     Answering Defendants admit the allegations of paragraph 7 of the Complaint.

8.     With respect to the allegations of paragraph 8 of the Complaint, Answering Defendants admit that Grossman Investments, LLC is a limited liability company organized under the laws of the State of Delaware and deny the remaining allegations of paragraph 8 of the Complaint.

9.     With respect to the allegations of paragraph 9 of the Complaint, Answering Defendants admit that Fannie Mae is a citizen of the District of Columbia for diversity purposes pursuant to 12 U.S.C. § 1717(a)(2)(B), and admit that ABCO Research, LLC and Ambient Consulting, LLC are residents of Minnesota for diversity purposes. Answering Defendants deny that Grossman Investments, LLC is a resident of Minnesota. The remaining allegations of paragraph 9 of the Complaint either do not relate to Answering Defendants, and

therefore no further response is required, or constitute legal argument to which no further response is required.

10.    With respect to the allegations of paragraph 10 of the Complaint, Answering Defendants admit that one or more of the Defendants resides in this District.  The remaining allegations of paragraph 10 of the Complaint constitute legal argument to which no further response is required.

11.    The allegations of paragraphs 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24 of the Complaint do not relate to Answering Defendants, and therefore no further response is required.

12.    Answering Defendants deny the allegations of paragraph 25 of the Complaint.

13.    With respect to the allegations of paragraphs 26 and 27 of the Complaint, Answering Defendants state that these allegations relate to the content of particular documents, and that Answering Defendants lack information sufficient to admit or deny these allegations and therefore deny such allegations.

14.    Answering Defendants deny the allegations of paragraphs 28, 29, 30, and 31 of the Complaint.

15.    Responding to paragraph 32 of the Complaint, Answering Defendants incorporate herein their responses to the allegations contained in paragraphs 1 through 31 of the Complaint.

16.    Answering Defendants deny the allegations of paragraphs 33, 34, 35, 36, and 37 of the Complaint.

17.     Responding to paragraph 38 of the Complaint, Answering Defendants incorporate herein their responses to the allegations contained in paragraphs 1 through 37 of the Complaint.

18.     Answering Defendants deny the allegations of paragraph 39 of the Complaint.

19.     Responding to the Complaint's Prayer for Relief, Answering Defendants deny any allegations contained therein, and Answering Defendants affirmatively allege that Plaintiff is not entitled to any of the relief sought in the Complaint's Prayer for Relief.

## SECOND DEFENSE

20.     Plaintiff's Complaint fails to state a claim or claims against Answering Defendants upon which relief can be granted.

## THIRD DEFENSE

21.     This Court lacks personal jurisdiction over defendant Grossman Investments, LLC.

## FOURTH DEFENSE

22.     As a separate alternative defense to Plaintiff's claims, Answering Defendants allege that the claims contained in Plaintiff's Complaint may be barred by any or all of the affirmative defenses contemplated by the Federal Rules of Civil Procedure, including without limitation lack of personal jurisdiction, improper venue, insufficient process, insufficient service of process, waiver, estoppel, laches, res judicata, and statute of limitations.   Answering Defendants

are without sufficient information to determine the extent to which Plaintiff's claims may be barred by any affirmative defenses. Therefore Answering Defendants incorporate all such affirmative defenses as if fully set forth herein and Answering Defendants reserve the right to amend their Answer to assert additional affirmative defenses in the future.

WHEREFORE, Answering Defendants respectfully request that the Court dismiss Plaintiff's Complaint against them in its entirety and award costs, disbursements, attorneys' fees and interest to Answering Defendants, along with any other relief that the Court deems just and equitable.

Date: January 4, 2013      PARKER ROSEN, L.L.C.

By:  s/ Daniel N. Lovejoy
    Daniel N. Rosen      Reg. No. 250909
    Daniel N. Lovejoy    Reg. No. 032646X
    300 First Avenue North, Suite 200
    Minneapolis, Minnesota 55401
    Telephone: (612) 767-3000
    Facsimile: (612) 767-3001

    ATTORNEYS FOR DEFENDANTS
    ABCO RESEARCH, LLC,
    AMBIENT CONSULTING, LLC, AND
    GROSSMAN INVESTMENTS, LLC